# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

S.C., by and through his Next Friend
M.C., et al.,

        Plaintiffs,

     v.

RIVERVIEW GARDENS SCHOOL
DISTRICT, et al.,

        Defendants.

Case No. 18- 4162-CV-C-NKL

## ORDER

This action was brought on behalf of homeless students who alleged that they were unlawfully denied an education by the defendants, Missouri Department of Elementary and Secondary Education and Roger Dorson (together, the "State Defendants") and Riverview Gardens School District and Special Administrative Board (together, the "District Defendants"). After more than eighteen months of litigation and negotiations, the parties reached a settlement that culminated in the Court's approving and entering a jointly proposed consent decree. Doc. 114 (the "Consent Decree" or "Consent Order and Judgment"). The Consent Decree provides sweeping relief designed to improve the lives of homeless students in the Riverview Gardens School District and throughout Missouri.

Plaintiffs' counsel now move pursuant to 42 U.S.C. § 1988 for $1,416,981.25 in fees and $2,444.61 in costs. For the reasons discussed below, Plaintiffs' motion for fees, Doc. 117, is granted in part.

## I.    BACKGROUND

Plaintiffs filed this action on August 13, 2018, asserting four claims: violation of the McKinney-Vento Act, violation of Section 504 of the Rehabilitation Act, violation of Title II of the Americans with Disabilities Act, and violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Doc. 1. Both the State and District Defendants moved to dismiss the case. Docs. 52, 63, 69. On February 25, 2019, the Court dismissed two out of the four claims, but denied the motions to dismiss as to (1) Part A of McKinney-Vento, which establishes critical rights for homeless students; and (2) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Doc. 82. Plaintiffs describe the McKinney-Vento Act as "the crux of this case and the basis for the settlement agreement and consent decree."

Shortly after the Court's ruling on the motions to dismiss, the parties began mediation through the Court's Mediation and Assessment Program. Docs. 6, 49 . Under the guidance of Magistrate Judge Willie J. Epps, who served as mediator, the Parties developed a Memorandum of Understanding ("MOU"), which Judge Epps signed on May 24, 2019. Doc. 112, Ex. A. In the MOU, the parties agreed to work together, rather than engage in protracted and expensive litigation, to resolve the issues that formed the basis of this lawsuit. The MOU required the Defendants to retain an expert who would review their implementation of McKinney-Vento and issue certain findings and recommendations that would become the basis for plans to implement changes in the Defendants' policies and practices to ensure their compliance with McKinney-Vento. *Id.* ¶¶ 1-9. The MOU provided that these "implementation plans" would be incorporated into a consent decree, which would also include monitoring requirements and court supervision for a three-year period. Although the parties agreed to stay the litigation, the settlement negotiations required them to address significant and complex issues relating to the policies and

2

practices of Defendants. The negotiations involved multiple meetings and conference calls between the parties and Defendants' expert, as well as the drafting of detailed implementation plans and terms in the Consent Decree. The Consent Decree included 95 action items and binding substantive commitments on the part of Defendants in the following areas:

- Identifying homeless students through outreach activities with other entities and agencies;

- Immediately enrolling—*i.e.*, ensuring students are able to attend school within 24 hours—students that the school identifies as homeless or students who present as homeless;

- Providing homeless students with transportation and other services for the duration of the school year or the duration of homelessness, whichever is longer;

- Making school placement determinations according to the student's best interest, communicating that placement determination in an understandable manner to the student's parent or unaccompanied youth, and providing an accessible dispute resolution process for challenging those school placement determinations;

- Enabling families to access the dispute resolution process for disputes concerning McKinney-Vento eligibility, school selection, and/or enrollment, including for the termination or suspension of transportation services. With regard to transportation, the student shall have the option to maintain their enrollment in the school selected by the parent, guardian, or unaccompanied youth and to maintain transportation to and from school throughout the dispute resolution process, including through all available appeals;

- Ensuring homeless students are not segregated from the student body, including ensuring the participation of eligible students in academic and extracurricular activities;

- Training all appropriate personnel on the requirements of McKinney-Vento;

- Providing semi-annual reports which will ensure compliance with the above-mentioned commitments;

- Regularly reviewing and revising the District's policies and practices that may be acting as a barrier to homeless students receiving the same free and appropriate public education as provided to other children and youths; and

- Providing for: (i) review of the District Defendants' semi-annual reports by an expert retained by the District Defendants; (ii) annual interviews of District personnel by the expert; and (iii) the development of a report by the expert with recommendations relating to any McKinney-Vento deficiencies.

Doc. 114. The Consent Decree also mandates semi-annual reporting and a three-year-monitoring period to ensure Defendants' continued compliance. *Id.*

Defendants have already begun to implement many of the provisions in the Consent Decree. Plaintiffs state that the Consent Decree provided them with the relief that they sought in initiating the litigation and will ensure that future homeless students do not experience the same barriers to their education that Plaintiffs faced.

## II.   DISCUSSION

### A.   Whether the MOU Limits or Alters the Fees that Plaintiffs May Recover from Defendants

#### 1.   The Express Terms of the MOU

As a threshold matter, the District Defendants argue that the MOU prevents Plaintiffs from recovering statutory attorneys' fees from them. According to the District Defendants, the MOU "imposed three limitations on any fee award from the District": (1) it could encompass only those fees "incurred to date," that is, May 24, 2019, the date on which the MOU was signed; (2) it required that fees be not only "reasonable," but also "necessarily incurred"; and (3) it excluded any work done in connection with claims that the Court had previously dismissed. Plaintiffs argue that they did not give up their right to recover statutory fees incurred after the date of the MOU because "nowhere does the MOU state that Plaintiffs gave up the right to seek subsequent fees reasonably incurred to achieve the successful conclusion of this litigation." Plaintiffs argue that, indeed, "the parties agreed that the matter of fees was left open for future resolution."

One of the opening paragraphs of the MOU explains the purpose of the MOU:

Subsequent to the mediation, the Parties agreed to a resolution of disputes and memorialize their agreement in this Memorandum of Understanding ("MOU") that shall be followed by a consent decree to be subsequently executed between the Parties. The Parties agree as follows: . . . .

Doc. 135-1.  The MOU expressly states, "this agreement concludes the litigation other than the matters specifically left open by this agreement, including the resolution of attorneys' fees . . . ." *Id.* ¶ 16.

Paragraph 19 is the only other provision of the MOU that addresses attorneys' fees.  It provides:

> District Defendants shall pay Plaintiffs' reasonable attorneys' fees and costs necessarily incurred to date with regard to the remaining claims against the District (but not claims against the State Defendants) in an amount to be determined by the Court.  State Defendants do not here agree to pay any attorneys' fees and reserve their rights to challenge any application or award of attorneys' fees, in whole or in part, sought to be imposed against State Defendants.

*Id.* ¶ 19.

As a settlement agreement, the MOU is interpreted according to the basic principles of contract law.  *Burgie v. Norris*, 369 F. App'x 768, 769 (8th Cir. 2010) (noting that "basic principles of contract law govern existence and enforcement of alleged settlement").  It is a basic tenet of contract law that the contract must be "read as a whole to determine the intention of the parties", *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003), and to give meaning to all contractual provisions, *Accident Fund Insurance Company v. Casey*, 550 SW3d 76, 81 n.5 (Mo. 2018).  Each clause must be read in the context of the entire contract, and interpretations that render provisions meaningless should be avoided.  *State ex. Rel. Pinkerton v. Fahnestock*, 531 S.W. 3d 36, 44 (Mo. 2017).  If possible, all provisions of the contract must be harmonized.  *Baker v. Bristal Care, Inc.*, 450 S.W.3d 770, 776 (Mo. 2014).

Clearly, the resolution of attorneys' fees is left open by the MOU, but paragraph 19 identifies with specificity what attorneys' fees issues remain open.  First, as to the State Defendants, there is no limitation, express or implied, placed on the Plaintiffs' right to recover attorneys' fees from the State Defendants.  Nor is there any obligation for the State Defendants to

pay attorneys' fees. Thus, Paragraph 16 specifically left open the resolution of attorney fees and Paragraph 19 clarified that the State Defendants reserved the right to challenge any application for attorneys' fees by the Plaintiffs. It did not limit what attorney fees were left open vis-à-vis the Plaintiffs and the State Defendants.

In contrast, Paragraph 19 specifies what attorney fees are left open vis-à-vis the District Defendants and the Plaintiffs. "District Defendants shall pay Plaintiffs' reasonable attorneys' fees and costs necessarily incurred to date with regard to the remaining claims against the District . . . to be determined by the Court." The logical inference is that the MOU left open the resolution of the amount of the District Defendants' obligation to pay attorneys' fees, but only as to the attorneys' fees identified in the MOU. Otherwise, one would have to assume that all attorneys' fee issues were left open for all parties, which would not explain why the MOU addresses what attorneys fees would be paid by the District Defendants. The Court's interpretation gives meaning to and harmonizes all provisions of the MOU, including the expressed intent of the parties to end the litigation as to all issues not specifically left open by the MOU.

Accordingly, the Court finds that the District Defendants are not obligated to pay attorneys' fees for work done by Plaintiffs after the date of the MOU and the fees owed by the District Defendants are limited to those that are reasonable and necessarily incurred to address the claims that remained against the District Defendants as of the date of the MOU.[1]

### 2. Whether "Necessary" Fees and Costs Are Different from "Reasonable" Fees and Costs

The District Defendants argue that, under the MOU, Plaintiffs may be awarded fees and costs only insofar as they establish that the fees and costs are not only reasonable, but also that

---

[1] In the section of this Order addressing the reasonableness of the hours submitted, Section II.D.2, the Court addresses the limitation of attorneys' fees to the claims that remained as of the date of the MOU.

they were "necessarily incurred," and that Plaintiffs have not met this burden. At oral argument, the District Defendants provided examples of fees that might be deemed reasonable but unnecessary: flying counsel from California to Missouri to interview witnesses or having four attorneys on a telephone conference might be reasonable, but they are not "necessary," they argue. Plaintiffs argue that the case law establishes that "reasonable" fees and costs are by definition "necessary." The District Defendants conceded that the parties did not discuss at the mediation whether the terms "reasonable" and necessary" in the MOU would have different meanings.

Case law indicates that there is no difference in the fee context between work that is "necessary" and work that is "reasonable" because reasonable fees are those that are not "unnecessary." *See, e.g., El-Tabech v. Clarke*, 616 F.3d 834, 843 (8th Cir. 2010) ("In determining whether a fee award is reasonable and necessary, the key component is the 'exclusion of 'hours that are excessive, redundant, or otherwise unnecessary.'" (quoting *Ass'n for Retarded Citizens of N. Dakota v. Schafer*, 83 F.3d 1008, 1012 (8th Cir. 1996); *Hensley,* 461 U.S. at 434); *Miller v. Dugan*, 764 F.3d 826, 832 (8th Cir. 2014) ("'"[H]ours that are excessive, redundant, or otherwise unnecessary" must be excluded' from the district court's determination of reasonable time expended on the case.") (quoting *El-Tabech*, 616 F.3d at 842; *Hensley*, 461 U.S. at 434). Given the absence of any language suggesting that the parties intended to create in the MOU a distinction between the terms not found in the case law, the Court will not distinguish between "reasonable" and "necessary" fees in this Order.

### B. Whether the State Defendants Are Liable for Attorneys' Fees

The Court may allow "the prevailing party" in certain civil rights actions to recover "a reasonable attorney's fee . . . ." 42 U.S.C. § 1988. A litigant is a "prevailing party" for attorneys' fees purposes "if they succeed on any significant issue in litigation which achieves some of the

benefit the parties sought in bringing suit . . . ." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Jenkins by Jenkins v. State of Mo.*, 127 F.3d 709, 714 (8th Cir. 1997) ("It is generally true that status as a prevailing party is determined on the outcome of the case as a whole, rather than by piecemeal assessment of how a party fares on each motion along the way.").

The "State Defendants do not dispute that Plaintiff is entitled [to] reasonable attorneys' fees, pursuant to the Joint Motion for Consent Order and Judgment." Doc. 132, p. 5 (citing Doc. 112). They do not contest whether the Plaintiffs are prevailing parties.[2] Therefore, the Court finds that Plaintiffs are entitled to their reasonable attorneys' fees from the State Defendants pursuant to the terms of 42 U.S.C. § 1988.

---

[2] The District Defendants argue that Plaintiffs are not prevailing parties with respect to them because the two plaintiffs enrolled in other school districts before the Consent Order and Judgment was entered. Because the Court has concluded that the MOU limits the fees that may be collected from the District Defendants, the question of statutory fees, and whether Plaintiffs prevailed as to the District Defendants, is not at issue. However, if the MOU did not limit the fees payable by the District Defendants, then the Court would have found that Plaintiffs were entitled to collect reasonable fees from the District Defendants under Section 1988 because Plaintiffs prevailed as to the District Defendants. McKinney-Vento permits a child or youth to "continue the child's or youth's education in the school of origin for the duration of homelessness . . . ." 42 U.S.C. § 11432(g)(3)(A). Riverview Gardens School District was S.C.'s school of origin at the relevant times. *See* 42 U.S.C. § 11432(g)(3)(I) (defining "School of origin" as "the school that a child or youth attended when permanently housed or the school in which the child or youth was last enrolled"). S.C. was still homeless and eligible for McKinney-Vento services from Riverview Gardens at the time that the Consent Order and Judgment was entered. Doc. 145, p. 4; *see also* Doc. 129 (Joint Stipulation of Plaintiffs and District Defendants), ¶¶ 4-6. The Consent Order and Judgment, which secures various rights for homeless students in Riverview Gardens School District and elsewhere, therefore benefited him directly when entered. *See Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 934 F.3d 238, 244 (2d Cir. 2019) ("A person need not claim the winner's prize to be a winner; it need only win the event. Chabad 'won' and became a prevailing party when it obtained a beneficial 'enforceable judgment.'"); *Virdi v. Dekalb Cty. Sch. Dist.*, 216 F. App'x 867, 872 (11th Cir. 2007) ("In Virdi's case, where the plaintiff has properly obtained an injunction and where there is clear record evidence supporting a reasonable likelihood of a future relationship with the defendant, it is inappropriate for a district court to deny prevailing status by speculating about whether the plaintiff is certain to take advantage of the changed legal landscape.").

## C.    Joint and Several Liability

As discussed above, in accordance with the terms of the MOU, the Court will not assess against the District Defendants fees incurred after May 24, 2019 (the date on which the MOU was executed) or fees attributable to the claims that did not survive the motion to dismiss.  The question that arises is how that affects the other parties.

Plaintiffs argue that the defendants are jointly and severally liable for fees, so insofar as the District Defendants are not responsible for attorneys' fees, the State Defendants should pay them.  At oral argument, the State Defendants argued that they should not be held jointly and severally liable for the fees, but they cited no law supporting their position and did not otherwise persuade the Court that joint and several liability is not applicable here.

The Eighth Circuit has noted that there is a "general rule that non-prevailing defendants are to be held jointly and severally liable for attorneys' fees . . . ."  *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1159 (8th Cir. 2014).[3]  This rule applies all the more where, as here, the "claims against multiple defendants are extremely inter-related, arising out of the same transaction or occurrence or series of occurrences and sharing common questions of law and fact." *Snider v. Peters*, 928 F. Supp. 2d 1113, 1119 (E.D. Mo. 2013), *aff'd sub nom. Snider v. City of Cape Girardeau*, 752 F.3d at 1149.  Here, not only did the claims against both sets of defendants arise out of the same series of occurrences and share common questions of law and fact, but also, by law, the State ultimately is responsible for "ensur[ing] . . . equal access to the same free, appropriate public education" for homeless children and homeless youth."  42 U.S. Code § 11431(1).  Indeed, the expert for the Defendants opined that, "[u]ltimately, under the McKinney-

---

[3] *Snider* also states that "the district court ha[s] discretion to apportion attorneys' fees" between multiple defendants.  *Id.*

Vento Act, [the District]'s noncompliance is the State's noncompliance." Doc. 118-2, p. 19. Because the State's liability encompasses the District Defendants' liability, application of the "general rule" of joint and several liability for attorneys' fees against the State Defendants is appropriate. Both the District Defendants and State Defendants will be jointly and severally liable for the fees owed under the MOU, and the State Defendants will be solely responsible for the remaining fees owed to Plaintiffs under the statute.

### D.     Reasonable Fees

Both the State Defendants and the District Defendants argue that, insofar as Plaintiffs are entitled to fees and costs, the amount of fees and costs that Plaintiffs seek is unreasonable.

The basis for any "reasonable" fee award under § 1988 is the lodestar calculation, the product of a reasonable hourly rate and the number of hours reasonably expended on the litigation. *See Hensley*, 461 U.S. at 433 ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."); *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005) ("The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates."). Because the MOU entitles Plaintiffs to "reasonable" fees from the District Defendants as well, the Court applies the lodestar methodology to determine the fees assessable against both sets of defendants. Thus, to determine whether the fees that Plaintiffs seek are reasonable, the Court must determine (1) a reasonable rate for the attorneys' time, and (2) the number of hours reasonably expended on the litigation.

### 1.     Whether the Proposed Hourly Rates Are Reasonable

In the Eighth Circuit, "a reasonable hourly rate generally means the ordinary fee for similar work in the community." *Little Rock Sch. Dist. v. State Ark. Dep't of Educ.*, 674 F.3d 990, 997

(8th Cir. 2012) (quotation marks and citations omitted). The goal of the lodestar method is to "roughly approximate[] the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010).

The burden of establishing the appropriate rate rests on the fee applicant. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) ("To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.").

### a) The Appropriate Market

Defendants argue that "some of Plaintiffs' attorneys seek hourly rates that are not based on rates usually charged by Missouri lawyers for similar types of work" and that those rates therefore must be reduced.

"A reasonable hourly rate is usually the ordinary rate for similar work in the community where the case has been litigated." *Emery v. Hunt*, 272 F.3d 1042, 1048 (8th Cir. 2001). Still, where local community rates would "not be 'sufficient to attract experienced counsel' in a specialized legal field," the appropriate rate may be determined by reference to "a national market or a market for a particular legal specialization . . . ." *Id.* (citations omitted). However, this "does not mean that a district court is forbidden in the ordinary case to focus on the community in which the case was litigated." *Miller*, 764 F.3d at 831-32. Indeed, if "a local lawyer, adequately versed in civil rights litigation, would have sufficed to attain the result that [the party's attorney] received while charging the ordinary [local] rate," or if the party's attorney "did not display the excellence,

or achieve the time savings, implied by [his] higher rate," the Court would be justified in basing a fee award on local market rates. *Id.*

Here, competent and willing local counsel was available to represent Plaintiffs. Much of the work in this case was performed by the Missouri-based attorneys at Legal Services of Eastern Missouri ("LSEM"). The Court recognizes that LSEM "contacted the Opportunity Under Law project at Public Counsel in summer 2017 regarding systemic violations of students' educational rights that were impacting LSEM's clients and community partners in the St. Louis region . . . because of (1) [the latter's] significant experience and specialized expertise in developing and litigating civil rights impact cases, including cases involving access to education for children and families impacted by trauma, homelessness, and poverty; and (2) their track record of success in obtaining favorable rulings and settlements for our clients in these matters." Public Counsel ultimately served as lead counsel in this case.

Nonetheless, because the seeds for this case were planted by Missouri lawyers who have demonstrated competence in the issues that were presented, the Court considers the proposed rates in the context of rates charged by lawyers based in Missouri. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, No. 2:13-cv-4022-NKL, 2018 U.S. Dist. LEXIS 190824, 2018 WL 5848994, at *3 (W.D. Mo. Nov. 7, 2018) (finding that "it would be inappropriate to view the fees in this case through the lens of a national, rather than a local, market" because, *inter alia*, "this is not a case in which the plaintiff was unable to find local counsel who could and would take its case").

### b) Comparable Rates

Plaintiffs are seeking rates between $450 and $790 for senior litigators, $225 and $450 for mid-career litigators, and $170 and $175 for paralegals and other non-attorney staff. Noting that

"Missouri Lawyers Weekly reports that in 2019 the median hourly rate in Missouri was $370, with some rates as high as $865," Plaintiffs argue that the hourly rates they request "are well within the customary rates charged by private attorneys in the St. Louis metropolitan area for civil litigation." *See* Doc. 118-14; https://molawyersmedia.com/2019/08/02/billing-rates-2019/.

Defendants argue that the high hourly rates shown in the Billing Rates publication are outliers and are not reflective of billing rates actually charged by attorneys. Defendants insist that the St. Louis median partner rate listed in that publication, $390 per hour, is the appropriate rate for the attorneys proposing the highest rates, attorneys Ulin and Rosen. As for Attorney Ferber, Defendants argue that, because his organization does not charge its clients, his hourly rate should be further reduced, to $250.

Defendants' suggestion that the most experienced litigators among Plaintiffs' counsel be awarded fees at only the median St. Louis partner rate is unpersuasive. As the Court has previously noted, "a partner might have just ten years of experience, while many of the plaintiffs' attorneys in this case have more than 30 years of experience." *M.B. v. Tidball*, No. 2:17-CV-4102-NKL, 2020 WL 1666159, at *6 (W.D. Mo. Apr. 3, 2020). Defendants do not explain why the median rate—which encompasses the rates of those with extensive experience and specialized knowledge and those who are less experienced—should be the ceiling for multiple attorneys who have decades of experience and, as discussed further below, specialized knowledge concerning civil rights law, issues relating to homelessness, and education rights. Defendants' suggestion that the Court treat the median rate as a ceiling is contrary to the law on the subject, which requires consideration of the "special skill and experience of counsel" in determining a reasonable rate. *See Hendrickson v. Branstad*, 934 F.2d 158, 164 (8th Cir. 1991) ("In determining whether a fee is reasonable, 'the special skill and experience of counsel should be reflected in the reasonableness of the hourly

rates.'") (citation omitted). The Court therefore will not cap rates at the "median" St. Louis partner rate, but will consider each attorney's rate in light of his or her experience and fees in Missouri for civil rights litigation.

Defendants' argument that attorney Ferber should be awarded fees at a further reduced rate because his organization offers *pro bono* services to its clients fares no better. The fact that counsel may be publicly funded "does not affect their right to fees." *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1377 (8th Cir. 1996). Indeed, the Supreme Court has held that reasonable attorneys' fees should be "calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum*, 465 U.S. at 895.

Plaintiffs also submit declarations of local attorneys attesting that local counsel's proposed rates are within the range of fees that Missouri lawyers charge for comparable litigation. John Ammann, an attorney with more than 30 years of litigation experience, states that "the hourly rates sought by Plaintiffs' counsel from Legal Services are at or below the market rate charged by similarly experienced attorney in the region." Doc. 118-10 ¶ 10. Kenneth Chackes, an attorney with more than 40 years of experience, particularly in civil rights litigation, opines that "the hourly rates sought by the Legal Services attorneys in this case are reasonable as they are within or below the range of market rates charged by similarly experienced attorneys in the St. Louis Metropolitan area for litigation." Doc. 118-11, ¶ 7. Thomas Kennedy, an attorney with nearly 50 years of experience, opines that the rates proposed by Plaintiffs' "local counsel" are "reasonable" as they are "within, or below, the range of market rates charged by similarly experienced attorneys in the St. Louis metropolitan area for litigation." 118-12, ¶ 10. Even the State Defendants acknowledge

that "[t]he rates sought by the Legal Services of Eastern Missouri attorneys seem to be far more in line with what is appropriate in circumstances such as the case at bar." Doc. 132, p. 12 n.3.

The attorney declarations Plaintiffs submitted are more measured in discussing the proposed rates for the out-of-state attorneys. Attorney Ammann opines that "Public Counsel's rates are reasonable with respect to the legal market in Missouri," noting that both that organization and the law firm of Arnold & Porter propose rates that are within the range of fees published in the Missouri Lawyers Weekly study. *Id.*, ¶¶ 11-12. Attorney Chackes similarly notes that "[t]he rates charged by out-of-state counsel are within the range of rates established by the Missouri Lawyers Weekly survey." Doc. 118-11, ¶ 7. Attorney Kennedy's declaration is silent on the matter. Doc. 118-12.

Plaintiffs argue that the proposed rates "are also in line with, or below, those being awarded in the Eighth Circuit and the Western District of Missouri." However, Plaintiffs have not cited a civil rights case in which a federal court within this district found rates exceeding $500 reasonable. In *Trinity Lutheran Church*, the Court awarded rates of up to $450 for First Amendment litigators. *Trinity Lutheran Church*, 2018 WL 5848994, at *14. More recently, in a civil rights class action, the Court found hourly attorney rates of up to $500 appropriate for some attorneys with 30 years' experience in litigating specialized civil rights issues. *M.B.*, 2020 WL 1666159, at *10; *see also D.L. v. St. Louis City Pub. Sch. Dist.*, No. 17 CV 1773 RWS, 2019 WL 1359282, at *2 (E.D. Mo. Mar. 26, 2019) (approving rates of $300 and $400 where plaintiff had submitted evidence "demonstrating billing rates of $200-$350 for 'attorneys' or 'associates' practicing employment or civil rights law in the St. Louis metropolitan area and billing rates of $350-$500 for 'partners' practicing employment or civil rights law in the St. Louis metropolitan area") (citation omitted)).

Defendants cite the fact that District Defendants' counsel, Attorney Layton, former Solicitor General for the State of Missouri, charged between $300 and $320 an hour for his time in this matter. One of the attorneys whose Declaration Plaintiffs cite, Mr. Kennedy, who has nearly 50 years of experience, states that he charges between $400 and $450 per hour for his time, between $300 and $350 for a partner with nine years of experience, $200 per hour for associates, and $125 for paralegals. Doc. 118-12 ¶ 7.

### c) Rulings on Attorneys' and Paralegals' Reasonable Rates

The Court considers the rates proposed for each attorney and paralegal in light of his or her experience and the available evidence of Missouri rates.

#### Legal Services of Eastern Missouri

Attorney Joel Ferber proposes an hourly rate of $450. He has nearly 35 years of experience in low-income legal advocacy, particularly public benefits and systemic healthcare, including extensive experience litigating complex state and federal cases. He is "routinely" asked to provide technical assistance to Missouri legislators on Medicaid and poverty law issues. He has been the Director of Advocacy for LSEM since 2009. In light of his experience and local rates, Mr. Ferber's proposed rate of $450 is reasonable. *See Trinity Lutheran Church*, 2018 WL 5848994, at *6 (adopting Missouri Attorney General's proposed rate of $450 for opposing First Amendment litigator with just 21 years of experience).

Attorney Luz Henriquez proposes an hourly rate of $350. Ms. Henriquez was LSEM's lead attorney in this case until February of this year, when she left to become the Executive Director of the ACLU of Missouri. Over 12 years of practicing law, particularly complex litigation, she has developed substantive expertise in education law, particularly laws relating to children experiencing homelessness, laws relating to discipline issues for children, and special

16

education law.  She has given presentations on Missouri education equity issues, including for the Missouri Bar and the National Association for the Education of Homeless Children and Youth. Given her experience and expertise, the Court finds Ms. Henriquez's proposed rate of $350 reasonable.  *See M.B.*, 2020 WL 1666159, at *11 (finding hourly rates of $350 reasonable for attorneys with more than ten years' experience).

Attorney Susannah Lake proposes an hourly rate of $250.  Ms. Lake has been practicing law for 5 years.  Her substantive experience includes education law, special education law, laws relating to children experiencing homelessness, laws relating to school discipline and racial justice, and community lawyering.  The Court finds Ms. Lake's proposed rate of $250 reasonable.  *See id.* at *13 (finding $250 rate appropriate for attorney with similar experience).

LSEM does not seek fees for any non-attorneys' work.

### **Arnold & Porter**

Attorney John Ulin proposes an hourly rate of $700.  A partner at Arnold & Porter Kaye Scholer LLP with 25 years of civil litigation experience, he has been recognized for litigation excellence by such publications as Chambers, the Los Angeles Daily Journal, and Super Lawyers. He has worked with Public Counsel on other cases, including in the areas of education and homeless rights.  He was the "principal trial counsel of record for Plaintiffs" in this case.  He states that his proposed rate is both "within the standards set forth by Missouri Courts, taking into consideration [his] position and years of experience" and also "comparable" to rates charged by senior partners in Chicago, New York, Los Angeles, and Washington, D.C.  Having considered the rates awarded in civil rights cases in the Western District of Missouri and the evidence submitted by Plaintiffs, the Court finds that $475 is a reasonable hourly rate for Mr. Ulin.  *See id.*

at *10 (finding an hourly rate of $475 appropriate for partner at large firm with 25 years of litigation experience).

Attorney Caitlin Mika proposes an hourly rate of $450. She has nearly six years of litigation experience. In light of her experience and the evidence of Missouri rates before the Court, $300 is a reasonable rate for Ms. Mika. *See id.* at *12 (finding hourly rate of $300 reasonable for attorneys with six or seven years of experience).

Attorney Hannah Henkel proposes an hourly rate of $300. She currently is a second-year associate, but she also clerked in the Eastern District of Texas and completed an additional year of litigation working at the Equal Employment Opportunity Commission. Given her experience and the evidence of Missouri rates, the Court finds that $200 is an appropriate rate for Ms. Henkel. *See id.* at *13 (finding $200 rate for attorney practicing since 2017 because her "legal experience [wa]s not extensive").

Paralegal Kenneth Anderson, who acted as "case manager," has 14 years of experience. He proposes an hourly rate of $170. Because the 2019 *Missouri Lawyers Weekly* Billing Rates publication shows a median rate of $175 for support staff in Missouri, who may include not only paralegals but other types of support staff that may be less skilled, the Court finds that Plaintiffs' proposed rate of $170 for Mr. Anderson is reasonable.

**<u>Public Counsel</u>**

Attorney Mark Rosenbaum proposes an hourly rate of $790. He is the Director of the Opportunity Under Law impact litigation project at Public Counsel in Los Angeles, California. Mr. Rosenbaum has been a lawyer for 46 years. He worked for the ACLU Foundation of Southern California for over 40 years, including as Legal Director and, most recently, as Chief Counsel. He was professor of law at University of Michigan for two decades and is currently a visiting professor

at the University of California, Irvine School of Law. He has successfully developed and litigated cases involving "novel and complex constitutional and civil rights claims, including in the areas of education, homelessness, social services, disability rights, healthcare, criminal defendants' rights, immigrants' rights, and international human rights." In light of Mr. Rosenbaum's extensive experience and expertise, the Court finds a rate of $600—which is markedly less than the $1,000 he says is his "typical" rate, but more in line with the rates Missouri courts have permitted in civil rights cases—reasonable for his time.

Attorney Alisa Hartz proposes an hourly rate of $450. She has been practicing law for eight years, including through federal district court and appellate court clerkships and in complex class action and other civil rights cases. Before she left Public Counsel in January 2020 to serve as a Deputy Legal Affairs Secretary to California Governor Gavin Newsom, she was the lead attorney on this case. Given her experience, but also prevailing local rates, and despite Ms. Hartz's "typical" billing rate of $490, the Court finds a rate of $325 appropriate for her time. *See M.B.*, 2020 WL 1666159, at *12 (finding rate of $325 appropriate for partner with eight years of litigation experience).

Attorney Amanda Savage proposes an hourly rate of $350. She took over Ms. Hartz's role as lead staff attorney. She has been a lawyer, focusing on civil rights law, and particularly education-related issues, for six years. Her experience includes working as a Staff Attorney with the Project on Predatory Student Lending at the Legal Services Center of Harvard Law School and as a fellow in the Civil Rights Division of the Massachusetts Attorney General's Office. In light of Ms. Savage's experience, but also local rates, and despite her "typical" rate of $420, the Court finds a rate of $300 appropriate for her time. *See id.* at *12 (finding rate of $300 appropriate for civil rights attorneys with six to seven years of experience).

Attorney Shahrad Ardaghi, who completed a one-year fellowship at Public Counsel, proposes an hourly rate of $225. Because of his limited experience, the Court finds a rate of $200 appropriate for Mr. Ardaghi's time. *See id.* at *13 (finding rate of $200 appropriate for 2017 and 2018 law graduates involved in civil rights litigation).

Researcher/organizer William Lacker proposes an hourly rate of $175. Because the 2019 *Missouri Lawyers Weekly* Billing Rates publication shows a median rate of $175 for support staff in Missouri, the Court finds that Plaintiffs' proposed rate of $175 for Mr. Lacker is reasonable.

The table below shows the Court's rulings concerning the rates for each person for whom Plaintiffs seek fees:

| Name | Requested Hourly Rate | Rates Set by Court |
|---|---|---|
| **LSEM** | | |
| Joel Ferber | $450 | $450 |
| Luz Henriquez | $350 | $350 |
| Susannah Lake | $250 | $250 |
| **Arnold & Porter** | | |
| John Ulin | $700 | $475 |
| Caitlin Martini Mika | $450 | $300 |
| Hannah Henkel | $300 | $200 |
| Kenneth Anderson | $170 | $170 |
| **Public Counsel** | | |
| Mark Rosenbaum | $790.00 | $600 |
| Alisa Hartz | $450.00 | $325 |
| Amanda Savage | $350.00 | $300 |
| Shahrad Ardaghi | $225 | $200 |
| William Lacker | $175 | $175 |

## 2.    Whether the Hours Expended Were Reasonable

"The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." *Hensley*, 461 U.S. at 433.  Inadequate documentation requires reduction of the fee award.  *Id.*  Furthermore, the Court "should exclude from this initial fee calculation hours that were not 'reasonably expended.'  Cases may be overstaffed, and the skill and experience of lawyers vary widely." *Id.*, at 434 (citation omitted).

"Billing judgment" is just as important here as it is in the private sector.  *Id.* (stating movant must make "a good faith effort to exclude from [the] fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission")  *Hensley*, 461 U.S. at 434.  "Hours that are not properly billed to one's client also are not properly billed to one's *adversary* pursuant to statutory authority." *Id.*

Here, Plaintiffs took multiple steps to ensure that the time for which they seek compensation is not excessive, including reviewing their records and exercising billing judgment to eliminate "hundreds of hours" from their submission, eliminating entirely the time for certain billers, including attorneys Lisa D'Souza and Amanda Schneider and others who were not primarily responsible for this matter, and not seeking compensation for work performed by the majority of paralegals, law student interns, and summer clerks.  Doc. 118, p. 8.  Plaintiffs' exercise of billing judgment resulted in a reduction of more than 1700 hours—more than 30% of the total time they expended on this case.  Doc. 145, p. 5.

Because Plaintiffs did not know if they would be compensated for their efforts in this case, they had an incentive to be efficient. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees.  The payoff is too uncertain, as to both

the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker."); *Tussey v. ABB, Inc.*, Case No. 06-4305-NKL, 2019 WL 3859763, at *5 (W.D. Mo. Aug. 16, 2019) ("Class Counsel brought this case without guarantee of reimbursement or recovery, so they had a strong incentive to keep costs to a reasonable level, and they did so.").

Still, Defendants raise multiple issues in arguing for a reduction in the hours. The Court considers these arguments below.

#### a) Whether the Dismissal of Two Counts Warrants Reduction of the Hours

Defendants argue that Plaintiffs' hours should be reduced because they did not prevail on two of the Counts in their complaint.[4]

Generally, "status as a prevailing party is determined on the outcome of the case as a whole, rather than by piecemeal assessment of how a party fares on each motion along the way." *Jenkins*, 127 F.3d at 714. "[F]ee-shifting statutes . . . favor[] treating a case as an inclusive whole, rather than as atomized line items." *Id.* (quoting *Commissioner, INS v. Jean,* 496 U.S. 154, 161–62, 110 S. Ct. 2316, 2320, 110 L.Ed.2d 134 (1990)). Thus, where "the plaintiff's claims for relief . . . involve a common core of facts or [are] based on related legal theories, . . . the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome and the

---

[4] Defendants argue that Plaintiffs' "hourly rates" also should be reduced for this reason, but Defendants cite—and the Court is aware of—no authority suggesting that the prevailing party's hourly rates should be reduced because it did not prevail on all counts.

court's rejection of or failure to reach certain grounds is not sufficient reason for reducing a fee." *Hensley*, 461 U.S. at 435.

Here, the Court dismissed the claims brought by two of the original plaintiffs and dismissed Counts II and III for failure to exhaust administrative remedies. Doc. 82, p. 18. However, Plaintiffs' request for relief was not materially altered by the partial dismissal. Rather, the Consent Decree "achieve[d] some of the benefit the [plaintiffs] sought in bringing the suit." *Hendrickson v. Branstad*, 934 F.2d 158, 161 (8th Cir. 1991); *see* Doc. 118, p. 2 ("The Consent Decree provides the sweeping injunctive relief that Plaintiffs sought when they filed this case."); *cf. Fast v. Sch. Dist. of City of Ladue*, 728 F.2d 1030, 1035 (8th Cir. 1984) (holding that "an award in the full amount requested would not be appropriate" where the plaintiff failed with respect to what "was probably the one thing she wanted most out of her suit"). Moreover, the claims that were dismissed and the claims on which Plaintiffs prevailed were interrelated—all were based on the alleged failure to accommodate homeless students. The fact that Plaintiffs raised alternative legal grounds in an attempt to achieve the results they secured in the Consent Order and Judgment "is not sufficient reason for reducing [the] fee" under the statute. *Hensley*, 461 U.S. at 435.

However, the District Defendants carved out an exception for themselves in the MOU. The parties agreed that the District Defendants would pay reasonable fees "with regard to the remaining claims against the District . . . in an amount to be determined by the Court." Therefore, the District Defendants are to pay only for the claims that survived the motion to dismiss.

Apparently to account for time Plaintiffs spent working on the two claims that the Court dismissed, the District Defendants propose that the Court eliminate all but 100 hours of the time that Plaintiffs' attorneys spent on this case before they filed the complaint. However, given that all of the claims that Plaintiffs initially asserted were related in fact and that they all sought the

same relief, the Court finds that such a drastic reduction of the pre-filing time would be inappropriate. The Court will reduce the District Defendants' liability for the 1331.5 of pre-filing hours by 25% (that is, 332.875 of the 3,925.1 hours for which Plaintiffs sought fees, which is 8.5% of the total hours submitted), to account for the dismissed claims.

### b) Consistency of Timekeeping Metrics

Defendants complain that Plaintiffs' exercise of billing judgment was not consistent from one attorney to the next. The first example they cite is that "Ms. Luz María Henríquez's time sheet indicat[es] she had conference calls with Mr. Joel Ferber that did not appear in Mr. Ferber's time sheet." However, Plaintiffs note that "Mr. Ferber's declaration indicates that he extensively reviewed all LSEM time records to *remove* such duplication." Indeed, Mr. Ferber expressly stated that his office "is not billing for time or services that [he] determined to be excessive, redundant, non-compensable or which I otherwise excluded in the exercise of billing judgement." Doc. 118-3 ¶ 13. The fact that some conference calls between Mr. Ferber and Ms. Henriquez were not reflected on both attorneys' time records indicates the exercise of billing judgment rather than improper billing practices.

Second, Defendants argue that, "even when some of the entries matched, there was a discrepancy in the amount of time the phone call lasted." Doc. 118-4, p. 42. However, although Defendants point to the time records for Mr. Ferber and Ms. Henriquez, Defendants do not cite any specific examples, and despite reviewing entries for such a discrepancy, the Court identified none.

Third, Defendants argue that "some entries are duplicated within the billing log." Doc. 132, p. 14. However, the only example on the page the State Defendants cite is of two time entries on April 28, 2019 for different periods of time (1 hour and 1.3 hours, respectively) that contain the

same description: "Revising review [*sic*] and revise draft expert expert [*sic*] report." Doc. 118-4, p. 42. The District Defendants similarly complain that Attorneys Henkel and Mika entered "duplicate" entries on February 27, 2019 and April 21 and 22, 2020. The identical descriptions Defendants identify do not by themselves suggest improper billing. It is not inherently improper for an attorney to break tasks up into different time blocks for a given day, nor is it inappropriate to use the same description of a task on more than one occasion. Spending 2.3 hours reviewing and revising a draft expert report does not appear unreasonable. In short, the Court sees no reason to reduce the referenced time entries.

### c) Time Spent Working on Amicus Brief

Defendants next argue that Plaintiffs should not shift fees incurred while working on an amicus brief. The Court has previously held that "time spent coordinating amici and reviewing their briefs—as distinct from reviewing and responding to opposing amicus filings—should not be shifted." *Trinity Lutheran Church*, 2018 WL 5848994, at *10 (W.D. Mo. Nov. 7, 2018); *see also Glassroth v. Moore*, 347 F.3d 916, 919 (11th Cir. 2003) ("The district court should not award plaintiffs any attorney's fees or expenses for work done in connection with supporting amicus briefs. (A reasonable amount of time spent reading and responding to opposing amicus briefs is, of course, compensable.)"); *North Dakota v. Heydinger*, No. 11-3232 (SRN/SER), 2016 U.S. Dist. LEXIS 136007, at **82-83 (D. Minn. Sep. 29, 2016) (deducting over $29,000 "for Plaintiffs' time spent coordinating with supporting amici"). The Court therefore reduces the hours for Plaintiffs' attorneys attributable to work relating to the supporting amicus brief (.6 hours for Mr. Ferber and 1.2 hours for Ms. Henriquez).

### d) Pre-Filing Work

Defendants argue that Attorney Hartz's devotion of approximately 100 hours to drafting the complaint is unreasonable given her self-proclaimed "extensive experience litigating issues related to homelessness, trauma, and educational equity, and [] specialized expertise . . . ." Defendants also argue that Plaintiffs in general spent an unreasonable period of time on this case before and through the date on which the complaint was filed, as ten attorneys and two non-lawyers spent a total of more than 1,300 hours on the case through the date of the filing of the complaint.

The Eighth Circuit has expressly held that "Section 1988 does not limit fee awards to work performed after the complaint is filed, but allows recovery of fees for time spent beforehand investigating facts and researching the viability of potential legal claims." *McDonald v. Armontrout*, 860 F.2d 1456, 1462 (8th Cir. 1988). The Eighth Circuit expressly permits recovery of fees "for 'research or investigation done' . . . to the extent it 'proved directly relevant to the successful prosecution of the later civil rights' action." *Id.* (citation omitted).

The complaint in this case was more than 80 pages in length, comprising more than 230 paragraphs. It contains not only detailed factual allegations concerning the plaintiffs, but also the policies and practices at issue as well as four legal theories to procure the relief that Plaintiffs sought. Despite the dismissal of two of the four claims, Plaintiffs ultimately achieved the results they sought in filing the complaint. As such, the Court sees no basis for reducing the time that Plaintiffs spent researching facts and law and strategizing to initiate their case—including time spent traveling to meet with potential fact witnesses or clients or to visit schools[5]—or the time that Ms. Hartz devoted to drafting and revising the complaint.

---

[5] *See Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 803-04 (8th Cir. 2015) (noting a "long recognized . . . presumption that a reasonable attorney's fee includes reasonable travel time billed at the same hourly rate as the lawyer's normal working time, absent a showing the award would be

### e) Other Purportedly Unnecessary or Duplicative Work

Defendants argue that Plaintiffs' attorneys seek fees for unnecessary or duplicative work. The first example State Defendants cite involves Attorney D'Souza, but Plaintiffs expressly explained that they eliminated Ms. D'Souza's hours from their fee request.

Defendants argue that it was unreasonable for attorney Henriquez to log .3 hours longer mooting an oral argument than Mr. Ferber, who actually argued the matter. The time records indicate that, on February 18, 2019, Mr. Ferber attributed 1.5 hours to "mock oral argument for MTD" while Ms. Henriquez attributed 1.8 hours to "Oral argument moot on MTDs." The Court resolves this discrepancy by reducing Ms. Henriquez's time by .3 hours.

Defendants argue that it was unreasonable for Attorney Lake to spend an hour or more sending an email on multiple occasions. However, the bulk of the time that Ms. Lake devoted to emails in the examples that Defendants cite was spent sending multiple emails, and those entries do not suggest that she devoted an excessive period of time to any particular emails. Doc. 118-5, pp. 9-12. Defendants also complain that Ms. Lake spent two hours drafting a "simple motion for extension of time." *See* Doc. 118-5, p. 15. However, the motion at issue—which was a joint motion by all of the parties, and therefore directly benefited Defendants as well—was more lengthy and detailed than the typical "simple motion for extension of time." It discussed the MOU, a prior joint motion for a stay, and the parties' efforts to move forward during the pendency of that stay, including expert review and recommendations and the parties' exchange of draft implementation plans. Doc. 99. The time that Ms. Lake devoted to drafting that motion therefore does not appear unreasonable.

---

unreasonable, for example, because the lawyer did not customarily charge clients for travel time" (internal quotation marks and citations omitted)).

The Court rejects Defendants' arguments that Attorney Mika should not receive her requested rate for the six-tenths of an hour she spent preparing *pro hac vice* motions—which appears neither excessive nor unreasonable. Likewise, Defendants' argument that Attorney Ulin should not receive his requested rate for "communications"—a task in which every practicing lawyer, regardless of seniority, must inevitably engage—or for researching "trauma claims," which is not an issue in which attorneys practicing civil rights law should necessarily be well-versed—is not persuasive. *Cf. Trinity Lutheran Church*, 2018 WL 5848994, at *10 (reducing time for purportedly experienced First Amendment litigators who "continued to research and draft memoranda on such basic First Amendment topics as 'Establishment Clause,' 'historical meaning of the establishment of religion,' 'free exercise,' 'Blaine Amendments,' 'government funding of religion,' 'special constitutional protection for religion," and "government subsidies to churches'" while preparing to litigate before the United States Supreme Court).

However, the Court finds that fees for attorney time spent making "travel arrang[e]ments"—an administrative task—are not appropriately shifted to Defendants and reduces that time accordingly (.5 hour for Attorney Hartz). Doc. 118-9, p. 48.

Finally, the Court considers Defendants' argument with respect to Plaintiffs' draft motion for preliminary injunction. Because the motion was never filed, Defendants argue that Plaintiffs should not be entitled to shift fees for the more than 660 hours of work devoted to that motion. Plaintiffs explain that filing the motion for preliminary injunction became unnecessary when settlement discussions between the parties progressed. Moreover, Plaintiffs argue that their work on the preliminary injunction motion "was important to the negotiated settlement of the case, as Plaintiffs converted their preliminary injunction suggestions and supporting declarations into a memorandum and narrative summaries that they submitted to Defendants' expert to assist her in

developing her findings and recommendations to reform District and State practices." Doc. 145, p. 14. Plaintiffs' preparation of the preliminary injunction motion contributed—directly or indirectly—to the parties' settlement. The fact that the case settled before Plaintiffs filed the motion does not render Plaintiffs' work unnecessary or unreasonable. The Court therefore will not reduce the time attributable to the preliminary injunction motion.

### f) Vague Time Entries

Defendants argue that "[s]everal" of Plaintiffs' time entries lack detail sufficient to convey whether a given task was related to this case or even whether it involved legal work. Defendants cite the following purported examples:

- "research federal regs" for .5 hours. Doc. 118-3, p. 16.
  - Because the time entry falls below an entry describing a memo to the litigation team "re: regulatory claims, concerns." The entries convey sufficient detail to show that the time was expended on legal research related to the potential claims and defenses in the litigation.
- "E-mails w/ Legal Team" for .2 hours. Doc. 118-4, p. 21.
  - The lack of detail concerning the topic of the communication warrants eliminating this time (.2 hours for Ms. Henriquez).
- "Review previously filed materials" for .9 hours.
  - Doc. 118- 4, p. 21. The lack of specificity with regard to the materials reviewed or the purpose of the review warrants eliminating this time (.9 hours for Ms. Henriquez).
- "Research" for .3 hours. Doc. 118-4, p. 23.
  - The lack of detail concerning the topic or purpose of the research warrants eliminating this time (.3 hours for Ms. Henriquez).
- Multiple "meeting[s] with community partner" amounting to more than 17 hours total. Doc. 118-5.
  - Insofar as these entries lack information concerning the topic or purpose of the meetings or any indication of how the communications were related to this case, the Court eliminates them (12.7 hours for Ms. Lake—*see* Doc. 118-5, pp. 4, 5, 7).
- "Email to fact w" for .9 hours. Doc. 118-5, p. 8.
  - Given the sensitivities surrounding this case, the Court will not penalize Plaintiffs for maintaining the confidentiality of certain fact witnesses.
- Various e-mails "f/LMH" or similar entries amounting to over 8 hours and various meetings or phone calls denoted "tel w/ cocounsel" or similar entries amounting to over 34 hours. Doc. 118-6.

- • As these time entries were by recorded by Attorney D'Souza, for whose time Plaintiffs do not seek fees, the Court disregards Defendants' argument on this point.
- • "MO Data schools" for 5.3 hours. Doc. 118-9, p. 76.
  - • Because it is not clear how the time entries for "MO Data Schools" and "MO school Data" are related to the Plaintiffs' efforts in the litigation and whether the work was legal in nature, the Court eliminates this time (5.3 hours for Attorney Ardaghi).
- • The timeline jumps significantly in the logs for Ms. Alisa Hartz. Doc. 118-9, pp. 48–70.
  - • Defendants' argument on this point places form over substance. The fact that Ms. Hartz' time entries are not presented purely in chronological order does not warrant reducing her time.

Reduction of the hours as discussed above is warranted given the "lack [of] sufficient detail to convey whether a given task was related to this case and whether it involved legal work." *Trinity Lutheran Church*, 2018 WL 5848994, at *12 (finding that "the attorneys' failure to submit sufficiently detailed descriptions for these entries warrant[ed] eliminating the associated time"); *see also Craig v. District of Columbia*, 197 F. Supp. 3d 268, 280 (D.D.C. 2016) (finding "insufficiently detailed" "many entries perfunctorily stat[ing] that counsel 'e-mailed' or sent an 'email to' someone, had a 'phone discussion w/' someone, or 'reviewed and responded to' an e-mail or a document").

Defendants also complain that "multiple attorneys vaguely list work on the same document, or preparing for the same telephone call, meeting, or hearing." The court addresses inefficiencies in communication because of the size of the legal team in a separate section below. As for Defendants' complaint about multiple attorneys working on one document, this is a standard approach for attorneys who work as part of a legal team—for example, attorneys with less experience and lower billing rates commonly research and draft papers that more senior attorneys with higher billing rates revise. This division of legal work is not by itself a basis for reducing attorneys' fees.

### g) Number of Attorneys

Defendants argue that Plaintiffs' hours should be reduced because they seek compensation for multiple attorneys from three distinct organizations: Public Counsel, Arnold & Porter, and Legal Services of Eastern Missouri. Here, the number of communications—emails, calls, and meetings—between the various lawyers to get up to speed on various issues (*see, e.g.*, Doc. 118-9, pp. 87–93 (describing multiple "Check in call[s] with LSEM and A&P"; Doc. 118-8, pp. 10, 13, 14, 19, 22 (describing multiple "[c]onference call[s] with litigation team")) are a hallmark of cases staffed by numerous lawyers. As the Court has observed previously,

> [T]he natural consequences of so many lawyers working on a single case is a large number of times entries for coordination between and consultation among counsel. While it is not unreasonable to task a number of attorneys with work on a case of this nature and scope, this kind of staffing necessarily comes with inefficiencies.

*Brown v. Precythe*, No. 17-CV-4082-NKL, 2020 WL 1527160, at *6 (W.D. Mo. Mar. 30, 2020). To account for such efficiencies, here, as in *Brown* and *M.B.*, the Court shall apply a 10% reduction to the attorneys' hours. *Brown,* 2020 WL 1527160, at *6; *M.B.*, 2020 WL 1666159, at *15; *see also Albright v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, No. 11CV01691 AGF, 2013 WL 4855304, at *4 (E.D. Mo. Sept. 11, 2013) (reducing hours "to account for the inefficiencies engendered by the involvement of three law firms in the case").

Although this case was complex and Plaintiffs' counsel have deep and varied legal experience, even considering Plaintiffs' argument that all three legal organizations needed to participate in the mediation, which required real-time negotiations, and noting that multiple attorneys participated in the mediation on behalf of both the District Defendants and the State Defendants, the Court cannot see a reasonable basis for shifting to the Defendants the fees for participation by more than three attorneys (one from each organization) in the mediation and argument on the motion to dismiss, or more than two attorneys to participate in any other court

appearance. Even after eliminating the time for three attorneys who attended the mediation session before Judge Epps in Jefferson City, Plaintiffs seek fees for four attorneys at that session. The Court eliminates time for the mediation from all but the most senior attorney from each organization (that is, the Court reduces Ms. Henriquez's time by 5 hours). Plaintiffs also seek fees for more than five attorneys' attendance at the oral argument on the motion to dismiss. The Court eliminates the time for all but the most senior attorney from each organization (that is, the Court reduces by 1 hour the time recorded by Ms. Henriquez, Ms. Lake, and Ms. Hartz). Finally, Plaintiffs seek compensation for three lawyers' participation in a conference call concerning a motion to extend the discovery schedule. The Court reduces the corresponding time for the attorneys who did not actively participate in the call (that is, the Court reduces by .1 hour the time recorded by Mr. Ferber and Ms. Hartz).

### h) Volume Discount

Finally, Defendants ask the Court to apply a "volume discount" to the remaining hours because "the fees are paid in effect by state and local taxpayers, and because state and local governments have limited budgets, money that is used to pay attorney's fees is money that cannot be used for programs that provide vital public services." As the Court has previously observed, "[t]axpayers of some sort typically bear the cost of litigation in civil rights cases when the plaintiff succeeds. If a special discount were warranted for that reason alone, then the legislature would have built a discount into Section 1983. However, the legislature did not do so." *M.B.*, 2020 WL 1666159, at *18. The fact that state and local governments will bear the attorneys' fees in this case does not warrant a volume discount.

**i)  Excluding Time Spent After Execution of the MOU from the Fees Payable by the District Defendants**

As discussed above, under the MOU, the District Defendants are liable for fees through the date of the MOU, but not fees incurred after that date.  The District Defendants propose that the Court eliminate from the fees allocable to them the time Plaintiffs' counsel spent on this case after the MOU was signed, which they calculate as 770 hours.  Doc. 135, p. 16.  Because the District Defendants do not provide a breakdown of the 770 hours by attorney, the Court will reduce the fees assessed against the District Defendants on a percentage basis.  770 hours represents approximately 19.6% of the 3,925.1 hours the Plaintiffs submitted.  The Court therefore will reduce the total fee assessed against the District Defendants by that percentage.

### j) Calculation of Hours

| Name | Hours Submitted | Hours Disallowed by Court | Hours Before 10% Discount | Hours After 10% Discount |
|---|---|---|---|---|
| **LSEM** | | | | |
| Joel Ferber | 353.9 | 0.7 | 353.2 | 317.88 |
| Luz Henriquez | 945.2 | 8.9 | 936.3 | 842.67 |
| Susannah Lake | 507 | 13.7 | 493.3 | 443.97 |
| **Arnold & Porter** | | | | |
| John Ulin | 262 | | 262 | 235.8 |
| Caitlin Martini Mika | 158.5 | | 158.5 | 142.65 |
| Hannah Henkel | 185.3 | | 185.3 | 166.77 |
| Kenneth Anderson | 33.5 | | 33.5 | 30.15 |
| **Public Counsel** | | | | |
| Mark Rosenbaum | 37.2 | | 37.2 | 33.48 |
| Alisa Hartz | 628.9 | 0.6 | 628.3 | 565.47 |
| Amanda Savage | 22.7 | | 22.7 | 20.43 |
| Shahrad Ardaghi | 353.8 | 5.3 | 348.5 | 313.65 |
| William Lacker | 437.1 | | 437.1 | 393.39 |
| **TOTAL** | 3,925.1 | 29.2 | 3,895.9 | 3,506.31 |

### 3. Lodestar Calculation

With the adjustments to the billing rates and hours of Plaintiffs' counsel discussed above, the lodestar calculation is as follows:

| Name | Rates Set by Court | Hours Allowed by Court | Total Fees |
|---|---|---|---|
| **LSEM** | | | |
| Joel Ferber | $450 | 317.88 | $143,046.00 |
| Luz Henriquez | $350 | 842.67 | $294,934.50 |

| | | | |
|---|---|---|---|
| Susannah Lake | $250 | 443.97 | $110,992.50 |
| **Arnold & Porter** | | | $0.00 |
| John Ulin | $475 | 235.8 | $112,005.00 |
| Caitlin Martini Mika | $300 | 142.65 | $42,795.00 |
| Hannah Henkel | $200 | 166.77 | $33,354.00 |
| Kenneth Anderson | $170 | 30.15 | $5,125.50 |
| **Public Counsel** | | | $0.00 |
| Mark Rosenbaum | $600 | 33.48 | $20,088.00 |
| Alisa Hartz | $325 | 565.47 | $183,777.75 |
| Amanda Savage | $300 | 20.43 | $6,129.00 |
| Shahrad Ardaghi | $200 | 313.65 | $62,730.00 |
| William Lacker | $175 | 393.39 | $68,843.25 |
| **TOTALS** | | 3,506.31 | $1,083,820.50 |

With the reductions specific to the District Defendants discussed above (a total reduction in attorneys' fees of 28.1%), the portion of the lodestar calculation attributable to District Defendants, to be shared jointly and severally with the State Defendants, is $779,266.94. The State Defendants alone are liable for the difference of $304,553.56.

The Court finds that the fees produced through the lodestar calculation, with the specific discounts discussed and reflected above, is reasonable and fair. *See Stallsworth v. Mars Petcare US Inc.*, No. 17-4180-NKL, 2018 WL 2125950, at *1 (W.D. Mo. May 8, 2018) ("There is a strong presumption that the lodestar calculation represents a reasonable fee award.") (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)); *see also Perdue*, 559 U.S. at 552 (stating that "the lodestar method yields a fee that is presumptively sufficient to achieve th[e] objective" of "induc[ing] a capable attorney to undertake the representation of a meritorious civil rights case"). The issues in this case were complicated, and because of the litigation, Plaintiffs secured ground-breaking, important relief for Plaintiffs and other homeless students in Missouri. A plaintiff who

has "won excellent results," as Plaintiffs have done here, "is entitled to a fully compensatory fee award . . . ." *Jenkins,* 127 F.3d at 716.[6]

### E.   Reasonable Expenses and Costs

"Reasonable expenses of litigation incurred by counsel on the prevailing side can be awarded as part of the fees due under Section 1988.". *Sapa Najin v. Gunter*, 857 F.2d 463, 465 (8th Cir. 1988); *see also Barrett v. Claycomb*, No. 11–CV–4242–NKL, 2013 WL 6920860 at *4 (W.D. Mo. Dec. 9, 2013) ("Plaintiffs are entitled to reimbursement for '[r]easonable expenses of the kind a law firm would ordinarily bill to its client.'").

Defendants argue that "[m]any of Plaintiff's proffered expenses exceed the scope of '[r]easonable expenses of the kind a law firm would ordinarily bill to its client . . . .'" Defendants object to certain attorneys' travel costs, but the Court has now ruled that one attorney from each organization was entitled to bill for attendance at the two major court appearances. Those travel costs therefore will not be excluded from the award. *See Williams v. ConAgra Poultry Co.*, 113 F. App'x 725, 728 (8th Cir. 2004) (holding that "travel expenses for attorneys" are among "expenses that a law firm normally would bill to its client" and therefore are "properly characterized as part of an attorney's fees award"); *Trinity Lutheran Church*, 2018 WL 5848994, at *14 (including travel expenses for attorneys in award). Defendants also raise concerns about a discrepancy between the actual court appearance dates and the dates on which the travel costs were

---

[6] Defendants argue that Plaintiffs' award should be compared to the $71,158.85 in fees incurred by the District Defendants in defending this case. However, here, there were two separate sets of attorneys representing the defendants, so the District Defendants' attorneys' fees represent only a portion of the work that Defendants' attorneys did in this case. More fundamentally, Defendants did not bear the burden of researching and drafting the complaint or preparing to move for injunctive relief, nor did Defendants' counsel play the same role that Plaintiffs' counsel did in ensuring that Defendants' proposed implementation plans were responsive to the needs of Plaintiffs and other homeless children. For these reasons, the District Defendants' attorneys' fees do not provide a good basis for comparison to Plaintiffs' attorneys' fees.

incurred.  However, such a discrepancy is not unusual:  travel plans often are made in advance and might be paid either in advance or after the fact.

Defendants also object to Plaintiffs' costs for five sessions of "fact development" incurred by Ms. Hartz.  Plaintiffs explain that Public Counsel staff traveled to the St. Louis region for fact development meetings before the case was initiated, and that "Public Counsel's specialized expertise in redressing barriers to educational access for children experiencing homelessness, trauma, and poverty clearly made its participation in early meetings with clients and factual witnesses essential to the success of the case."  The Court has now approved time that Plaintiffs' counsel incurred in conducting fact investigation in preparing to file this suit.  The Court will not disallow costs related to those efforts.

Insofar as Defendants object to Plaintiffs' request for fees incurred in obtaining *pro hac vice* admission to the Court, the Court overrules the objection.  As the District Defendants expressly recognized, such costs are properly taxable.  Paying court fees for attorneys who are based outside of Missouri to participate in court proceedings is an entirely reasonable expense, particularly given the out-of-state attorneys' specialized knowledge, experience, and resources, which proved valuable in this case.

The District Defendants' argument that fees for service of process were not reasonable because Plaintiffs did not attempt to seek a waiver from the District prior to attempting service is unconvincing.  The Federal Rules do not impose an obligation on a plaintiff to request waiver of service.  *See* Fed. R. Civ. P. 4(d).  Plaintiffs are entitled to reimbursement for the cost of effecting service on each Defendant.

Finally, Plaintiffs are entitled to reimbursement of the $29.61 in costs they incurred for air delivery services.  Courier costs are a routine expense in litigation, and these charges do not appear

disproportionate.

In short, having reviewed Plaintiffs' expenses and costs and Defendants' objections to them, the Court sees no basis for disallowing reimbursement of any expenses.

However, in accordance with the MOU, the Court may allocates to the District Defendants only fees incurred before the MOU was signed. Therefore, $1727.32 in travel costs post-dating execution of the MOU shall be excluded from the expenses chargeable to the District Defendants. With the $5,983.43 in expenses ($7,710.75 minus $1,727.32), the total fee award for Plaintiffs against the District Defendants, to be shared jointly and severally with the State Defendants, is $785,250.37. The State Defendants alone are responsible for the additional $306,280.88 in fees due to Plaintiffs.

Also in accordance with the MOU, the Court shall exclude costs that are attributable solely to the State Defendants. Therefore, $785 in service fees attributable to the State Defendants must be excluded from the costs assessed against the District Defendants. The District Defendants and State Defendants are jointly and severally liable for $1,659.61 in costs. The State Defendants alone are liable for the additional $785 in costs due to Plaintiffs.

## III. CONCLUSION

For the reasons discussed above, the Court grants in part and denies in part the motion for fees and expenses. The Court awards to Plaintiffs' counsel a total of $1,091,531.25 in fees and the $2,444.61 in costs requested in the Bill of Costs. The District Defendants and State Defendants are jointly and severally liable for $785,250.37 of those fees and $1,659.61 of those costs. The

State Defendants are solely liable for the remaining $306,280.88 in fees and $785 in costs.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  September 3, 2020
Jefferson City, Missouri